# In the United States Bankruptcy Court
## for the
## Southern District of Georgia
### Statesboro Division

In the matter of:        )
                           )

BYRON LESTER JARRIEL,    )    Chapter 12 Case
                           )

         *Debtor.*    )    No. <u>13-60070-EJC</u>
                           )

                           )

TIPPINS BANK AND TRUST,   )
                           )

        *Movant,*    )
                           )

v.                           )

                           )

BYRON LESTER JARRIEL,    )
                           )

        *Respondent.*    )
                           )

**FILED**
Lucinda B. Rauback, Clerk
United States Bankruptcy Court
Savannah, Georgia
*By dreese at 5:44 pm, Sep 11, 2014*

## OPINION AND ORDER GRANTING AMENDED APPLICATION FOR REIMBURSEMENT OF ADMINISTRATIVE EXPENSE

Byron Jarriel's ("<u>Debtor</u>") most valuable assets are farming equipment and land. A few months before the Debtor filed his Chapter 12 petition, he allowed his insurance coverage to lapse on a 1990 John Deere Combine Model 9600 ("<u>Combine</u>") and a 1994 John Deere Flex Header Model 920 ("<u>Flex Header</u>"). After filing his petition, the Debtor continued to fail to insure the equipment. Acting under its loan documents with the Debtor, Tippins Bank and Trust ("<u>Bank</u>") obtained forced-place insurance on the Combine and Flex Header. Due to an inadvertent error, the Bank released its lien on all of its collateral, including the Combine and Flex Header, without first being reimbursed for the insurance

expenses. Because the cost of insuring this equipment postpetition is among "the actual, necessary costs and expenses of preserving the estate" within the meaning of 11 U.S.C. § 503(b)(1)(A), the Court will allow the Bank's request for payment of an administrative expense as modified below.

Before the Court is the Amended Application for Reimbursement of Administrative Expense ("Application") (dckt. 117) filed by the Bank. On April 15, 2014, the Court held a hearing on the original version of the Application (dckt. 96). At the hearing, the Debtor objected to the Bank's request on the grounds that the amount of the insurance premiums are unreasonably high; the insurance coverage was unnecessary because the Bank's collateral exceeded the amount of its loan by a large margin; and the Bank cannot now seek reimbursement of the expenses because it has released its collateral. The Court heard testimony from the Debtor and the Bank's President, C. Paul Eason. After the hearing, the Bank amended its administrative expense request to reduce the amount sought by the amount of premium refunds that it had received. (Dckt. 117.) Both parties have submitted briefs on the issues raised at the hearing. (Dckts. 121–22.)

I.     JURISDICTION

This Court has jurisdiction pursuant to the following sources: sections 151, 157(a), and 1334(b) of Title 28 of the United States Code and the United States District Court for the Southern District of Georgia's Order dated July 13, 1984, which refers all cases under Title 11 of the United States Code to the bankruptcy judges in the district.

This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(B). Furthermore, venue is proper. *See* 28 U.S.C. §§ 1408–1409. In accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure, I make the following Findings of Fact and Conclusions of Law.

## II.   FINDINGS OF FACT[1]

### A.   Introduction

The Bank was an oversecured creditor in this Chapter 12 case and had every expectation that its debt would be paid in full. Indeed, the Debtor's original confirmed plan provided that the Bank's claims of $38,806.62 and $9,665.08, which were cross-collateralized by 43.85 acres of land ("Tattnall Property"), a mobile home, the Combine, and the Flex Header, would be paid in full plus interest over a nine-year period. (Dckt. 61, at 6–7.) After the plan was confirmed, the Debtor instead elected to sell, with the Court's approval, the Tattnall Property, which should have extinguished the Bank's debt entirely. (Dckts. 82, 90.) Unfortunately, when the closing took place, the Bank neglected to include the cost of the forced-place insurance premiums for the Combine and Flex Header when it quoted its loan payoff figure. The Bank now seeks to be reimbursed for those premiums as an administrative expense, and the Debtor opposes that request.

---

[1] The Court takes judicial notice of certain facts in the docket of this case. *See* Fed. R. Evid. 201. The following facts were either proven or are the proper subject of judicial notice.

B.    The Bank's Claims and Collateral

        The Debtor filed this Chapter 12 case on February 2, 2013. (Dckt. 1.)  In his schedules, the Debtor listed the Bank as a creditor with a fully secured claim of $37,759.74. (Dckt. 11, at 11.)  In Schedule D, the Debtor lists the following property as collateral securing the Bank's claim: the Tattnall Property, the Combine, and the Flex Header.  According to Schedule A, the value of the Tattnall Property is $55,200.00. (Dckt. 11, at 4.)  According to Schedule B, the value of the Combine is $40,000.00 and the Flex Header is worth $8,000.00. (Dckt. 11, at 8.)

        The Bank has filed two proofs of claim in this case, and the Debtor did not object to either claim.  The first claim is for $38,806.62 and is secured by the Tattnall Property and a UCC-1 on a the Combine and Flex Header. (Claim 2.)  The second claim is for $9,665.08 and is secured by 1.85 acres and a double-wide mobile home owned by the Debtor's son as reflected in the commercial security agreement attached to the proof of claim. (Claim 3.)

C.    The Debtor's Obligation to Insure Collateral

        On February 17, 2012, the Debtor executed a promissory note and security agreement in the original principal amount of $35,837.75. (Bank's Ex. 1.)  The note was secured by the Tattnall Property, the Combine, the Flex Header, and equipment attached thereto or later acquired.  The Security Agreement also included the following provision regarding the Debtor's obligation to insure the equipment:

19. INSURANCE.  I agree to obtain the insurance described in this Loan Agreement.

. . . .

B. Property Insurance.  I agree to keep the Property Insured against the risks reasonably associated with the Property.  I will maintain this insurance in the amount you require.  This insurance will last until the Property is released from this Loan Agreement. . . .

. . . .

I will immediately notify you of cancellation or termination of Insurance.  If I fail to keep the Property Insured, you may obtain insurance to protect your Interest in the Property and I will pay for the Insurance on your demand.  You may demand that I pay for the Insurance all at once, or you may add the Insurance premiums to the balance of the Secured Debts and charge interest on it at the rate that applies to the Secured Debts.  This insurance may include coverages not originally required of me, may be written by a company other than one I would choose, and may be written at a higher rate than I could obtain if I purchased the insurance . . . .

. . . .

(Bank's Ex. 1.)

Counsel for the Debtor stated that the Debtor insured the Combine and Flex Header until August 20, 2012 but failed to do so after that date.[2]  The Bank did not dispute this statement.  At the § 341 meeting of creditors held on March 7, 2013, counsel for the Debtor told Eason that the Debtor would obtain the required insurance.  But, for some reason not explained, he never did.

---

[2] The Bank tendered an exhibit, which was a letter from Georgia Farm Bureau Mutual Insurance Company to the Bank, that suggested the insurance coverage may have been canceled on January 8, 2012.  (Bank's Ex. 2.)  That letter also stated that specific information concerning the cancellation had been provided to the insured.  (*Id.*)

D.      The Bank's Acquisition of Insurance and Payment of Premiums

        The Bank spent $4,132.00 on insurance premiums for the Combine and Flex Header. (Dckt. 117, ¶ 2.) More specifically, on March 13, 2013 (after the petition date), the Bank paid (as reflected in the Bank's debit transaction form) $1,553.00 to insure the Combine and $513.00 to insure the Flex Header, or a total of $2,066.00 for the period of August 12, 2012 to August 12, 2013. (Bank's Exs. 3–5.) Similarly, on October 22, 2013, the Bank paid the insurance premiums again, in the same amounts, or a total of $2,066.00 for the period of August 12, 2013 through August 12, 2014. (Bank's Exs. 6–9.)

E.      The Bank's Release of Collateral

        On January 22, 2014, the Debtor filed the Motion to Sell (dckt. 84), which sought the Court's approval to sell the Tattnall Property and the mobile home for $70,000.00. The Bank had a first-priority lien, so the proceeds should have satisfied its debt in full. The sale was approved by this Court's Order of February 25, 2014 ("Sale Order") (dckt. 90). The Sale Order provided for the disbursement of proceeds as follows:

(a)    Payment to Tippins Bank and Trust in the amount of $51,775.31 as of 1-17-14 with interest accruing at the rate of $6.97/day each day thereafter through the date of closing;[3]

(b)    Payment of all real estate taxes due through 12-31-13 in the amount of $926.12 including any penalties and interest through the date of closing;

(c)    Payment to Crop Production Services, Inc. in the amount of

---

[3] The Motion to Sell reflected a payoff of $50,904.23 as of January 17, 2014 with the same per diem of $6.97. (Dckt. 82, at 2.)

♦AO 72A
(Rev. 8/82)

$5,000.00;

(d)    Payment of all remaining net proceeds to A. Stephenson Wallace, Chapter 12 Trustee.

(Dckt. 90, at 1 (footnote added).)  The Sale Order further provided: "Upon receipt of the funds from the sale, [the Bank] shall cancel its security deeds, and otherwise release any interest it has upon the real property described in the attached Sales Agreement and release any of Debtor's *personal property which may be collateral* to [the Bank]."  (Dckt. 90, at 1 (emphasis added).)  The Sale Order was consented to by the Bank's attorney of record.  (Dckt. 90, at 2.)

The sale apparently occurred some time prior to March 26, 2014 because the Debtor's amended plan reflects that "all principal and interest owing to [the Bank] has been paid in full" from the sale of the Tattnall Property and the mobile home.  (Dckt. 107, at 6–7.)

After receiving its payment from the Tattnall Property sale, the Bank held up its end of the bargain by cancelling its security interests in all of its collateral.  The Bank also cancelled its insurance coverage on the Combine and Flex Header once the Tattnall Property sale occurred, and it was refunded portions of the premium amounts.[4]

---

[4] At the April 15, 2014 hearing, the Bank's counsel announced that certain premium refunds would be credited against this amount.  The Court instructed counsel to amend its application to show a more detailed calculation of the premiums paid and the refunds for unearned premiums.  The relevant paragraph that was added to the Application reads:

The Bank contends, and the Debtor does not dispute, that the $51,775.31 payoff figure that was disbursed to the Debtor did not include the insurance premiums that are the subject of the Application.  Simply put, the Bank made a mistake.

## III.   CONCLUSIONS OF LAW

Section 503 of the Bankruptcy Code controls what may be allowed and paid as an administrative expense.  For the most part, administrative expenses are expenses incurred by the estate postpetition and are given priority over most prepetition claims. *See* Paul R. Hage & Patrick R. Mohan, *Recent Developments in Section 503—Administrative Expenses and Key Employee Retention, Incentive and Severance Plans*, 2014 Ann. Surv. Bankr. L. 617, 617 (William L. Norton, Jr. et al. eds., 2014). "Section 503 gives priority to creditors who incur costs in the preservation of a bankrupt business, such as rent or compensation for ongoing, post-petition operations.  This encourages parties to conduct business with a post-petition debtor because such administrative claims are accorded the first level of priority and are paid in full before claims in a lower category."  *Park Nat'l Bank v. Univ. Centre Hotel, Inc.*, No. 1:06-cv-00097-MP-AK, 2007 WL 604936, at *5 (N.D. Fla. Feb. 22, 2007).

---

Following the sale of the Bank's real estate collateral, the Bank released the combine and the flex header and received a refund of $706.00 on the combine and $233.00 on the flex header.  When these amounts are credited to the force-place insurance premiums, the amount owing to the Bank is $3,193.00.

(*Id.*, ¶ 3.)  As will be addressed below, only a portion of the $3,193.00 represents postpetition expenses paid by the Bank.

Under § 503(b)(1)(A), administrative expenses include the "actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A). One reason that these expenses are awarded priority is to prevent the unjust enrichment of the bankruptcy estate. *See In re Sanjeev and Rajeev, Inc.*, 411 B.R. 480, 482 (Bankr. S.D. Ga. 2008) (Davis, J.). "Despite the expansiveness with which the administrative expense category may be treated, such judicial construction is limited by the countervailing doctrine that section 503 priorities should be narrowly construed in order to maximize the value of the estate preserved for the benefit of all creditors." *Varsity Carpet Servs., Inc. v. Richardson (In re Colortex Indus., Inc.)*, 19 F.3d 1371, 1377 (11th Cir. 1994) (citing Otte v. United States, 419 U.S. 43, 53 (1974)).

Regarding the timing of an administrative expense request, Bankruptcy Code § 503 provides in relevant part:

(a) An entity may timely file a request for payment of an administrative expense, or may tardily file such request if permitted by the court for cause.

11 U.S.C. § 503(a). Therefore, the Bank must first show that it filed a timely request for an administrative expense or be excused from the timeliness requirement "for cause." 11 U.S.C. § 503(a). The parties acknowledge that the Court has not set a bar date for administrative expense claims and no such bar date was ever requested.[5] Accordingly,

---

[5] *See Hall Fin. Grp. v. DP Partners, Ltd. P'ship (In re DP Partners Ltd. P'ship)*, 106 F.3d 667, 672 (5th Cir. 1997) ("[Section 503(a)] appears intentionally vague and broad. Legislative history reveals that Congress intended to leave the setting of specific filing deadlines to the Rules of Bankruptcy Procedure. The Rules of Bankruptcy Procedure, in turn, largely defer that duty to the bankruptcy judges. As a result,

✎AO 72A
(Rev. 8/82)

the Application will be deemed timely for purposes of § 503(a).

A.      The Two-Prong Test

        "Courts generally apply a two-prong test to determine whether a claim

qualifies as an administrative expense: (1) the expense must have arisen from a

post-petition transaction between the creditor and the debtor, and (2) the expense must

have been 'actual and necessary' to preserve the estate." *In re New Century TRS

Holdings, Inc.*, 446 B.R. 656, 661 (Bankr. D. Del. 2011). "There must be an actual

concrete benefit to the estate before a claim is allowable as an administrative expense."

*Broadcast Corp. of Ga. v. Broadfoot (In re Subscription Tel. of Greater Atlanta)*, 789

F.2d 1530, 1532 (11th Cir. 1986). The Bank, as the movant, has the burden to prove by a

preponderance of the evidence that the administrative expense request should be allowed.

*See In re Sports Shinko (Florida) Co., Ltd.*, 333 B.R. 483, 492 (Bankr. M.D. Fla. 2005).

        Regarding the first prong, the Court finds that the expense arose, in part, out

of a postpetition transaction, as shown by the dates on the insurance certificates obtained

by the Bank. That is, the period of the insurance coverage paid for by the Bank was

August 12, 2012 to August 12, 2014, which included a prepetition period. (Dckts. 4–5,

8–9.) Moreover, the Court finds that the transaction was between the creditor and the

Debtor because the security agreement contemplated the Bank purchasing this insurance

---

bankruptcy judges have, for some time, been accorded discretion in setting
administrative-claim bar-dates." (footnotes omitted)).

if the Debtor decided to keep the Bank's collateral without obtaining insurance himself.

As to the second prong, the Court has no difficulty finding that the cost to insure these valuable estate assets are an actual and necessary expense. With exceptions not relevant here, a Chapter 12 debtor in possession has the rights and powers and must perform the "functions and *duties*" of a Chapter 11 trustee, "including operating the debtor's farm." 11 U.S.C. § 1203 (emphasis added). The necessity of insuring estate property, as a general matter, cannot be seriously questioned. *See Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 226 F.3d 237, 243 (3d Cir. 2000) ("If one is appointed, a trustee is an officer of the Court having certain fiduciary duties. If a trustee is not appointed, the debtor-in-possession assumes those fiduciary duties the same as would an appointed trustee. Included among the fiduciary duties of a debtor-in-possession is protecting and conserving estate assets for the benefit of creditors. This is a paramount duty of a trustee or, as the case may be, of a debtor-in-possession." (citations omitted)); *Campbell-Erskine Apothecary, Inc.*, 302 B.R. 169, 174 (Bankr. W.D. Pa. 2003) ("Insuring estate property against loss or destruction is one of the fundamental aspects of this fiduciary duty. Failure to do so can have 'dramatic consequences,' including dismissal of the bankruptcy case for cause in accordance with § 1112(b) of the Bankruptcy Code." (quoting *In re Ind. Walnut Prods., Inc.*, 136 B.R. 522, 525 (Bankr. N.D. Ind. 1991))). In this case, insuring the Combine and Flex Header was especially important because the loss of those significant assets would have had

severe economic consequences to the bankruptcy estate and the postpetition failure to insure the equipment would have likely constituted cause for stay relief under § 362 of the Bankruptcy Code. Therefore, when the Bank took action to insure property of the bankruptcy estate, it was doing something that the Debtor clearly should have done. Further, it is immaterial that the Debtor never made a claim under the insurance policies; the actual benefit it received was the protection from risk of loss during the coverage period.[6]

For those reasons, the Court finds that the second prong of the test is satisfied and that the insurance premiums were actual and necessary expenses to preserve the estate. However, as explained more thoroughly in Part III.B.4 below, a portion of the premiums related to a prepetition period.[7] Expenses attributable to that period are not necessary to preserve estate property because the bankruptcy estate was not yet in existence. *See* 11 U.S.C. § 541(a).

B.    The Debtor's Objections

In his brief, the Debtor argues that the Bank's request for an administrative expense should not be allowed because (1) the Bank failed to prove it actually paid the

---

[6] Eason testified that the Combine had actually "burned" once before under a prior policy.

[7] In the Application, the Bank acknowledges that $986.58 may be "apportioned" to a prepetition time period. (*See* dckt. 117, ¶ 4.)

premiums; (2) it was unnecessary to purchase insurance because the Bank was oversecured and the amount paid for the insurance was unreasonable; (3) the amount requested includes prepetition amounts; and (4) the request is precluded by the Sale Order or the plan confirmation order due to estoppel or res judicata. The Court will address each of these objections in turn.

### 1.    *Actual Expenses*

The Debtor's counsel argued at the conclusion of the hearing that the Bank failed to prove that it had actually paid the premiums. The Court finds that the certificates of insurance were issued and that the Bank's records show the payments for the insurance. This is sufficient proof that the payments were actually made. As discussed below, however, not all of the premiums paid may qualify to be an allowed administrative expense.

### 2.    *Necessity and Reasonableness of the Expenses*

Regarding the necessity of the expenses incurred in this case, the Debtor questions both the amount of the premiums incurred and the need to obtain insurance when the Bank had other collateral that was sufficient to cover its notes. As to the amount of the premiums, the Court is not persuaded that the premiums were unreasonable. Eason acknowledged that forced-place insurance is more expensive, but the Court is left to speculate as to the reasons that might be true. The Debtor testified

about a policy he had been offered that seemed to reflect substantially lower premiums for the two pieces of collateral at issue. (Debtor's Ex. 1.) But, as the Bank's counsel pointed out, the policy quote covered numerous items (raising the question of whether a quantity discount was at work), and the deductible was $1,000.00 per loss on the Debtor's policy quote compared to the $175.00 deductible under the Bank's policies.

The Debtor misunderstands the aim of "necessary" regarding administrative expenses. What matters is that what the expense is used for is necessary to preserve the bankruptcy estate, which is clearly met. *See supra* Part III.A. It is immaterial whether the insurance coverage was necessary to protect the Bank's secured claim; that is an adequate protection argument. Accordingly, the Court concludes that the premiums are necessary expenses of preserving estate property.

3.   *Expenses After the Commencement of the Case*

The Bank asserts that these insurance expenses are compensable under § 503(b)(1)(A). Section 503(b)(1)(A) expenses are limited to postpetition expenses. In this case, the Bank requests administrative expense status for insurance premiums paid postpetition but for insurance coverage that extended prepetition. It is unclear how (or why) coverage issued on March 26, 2013 was made retroactive to August 12, 2012, but only the insurance coverage relating to the postpetition period may qualify as an administrative expense under § 503.

Nevertheless, the Court can allocate the total premium between the prepetition and postpetition periods to arrive at the correct figure. *See In re Payless Cashways, Inc.*, 305 B.R. 303, 308 (Bankr. W.D. Mo. 2004) (calculating a per diem value of the insurance coverage by dividing the value of the services provided by the total number of days covered by the policy). The total cost to insure the Combine and Flex Header was $2,066.00 for the period of August 12, 2012 to August 12, 2013. Therefore, the per diem value of the insurance was about $5.66.[8] Because I find that 174 days of the policy period were attributable to prepetition coverage, I calculate the total amount the insurance expenses attributable to prepetition coverage to be $984.84.

4.      *Preclusive Effect of the Sale Order and the Plan Confirmation Order*

The premiums paid by the Bank represent a component of the debt owed by the Debtor. When the bank quoted its payoff amount for purposes of the sale closing, which was incorporated into the Court's Sale Order, the Bank forgot to include the cost of insurance; however, the Sale Order does not preclude the Bank from requesting the allowance of an administrative expense. The Sale Order only limits the Bank's rights in one way. It requires the Bank to cancel its security deeds upon the real property and release its security interests in the Debtor's personal property. The Sale Order does not recite that the Bank will forfeit all right to be reimbursed for past expenses or claim that it is still owed money by the Debtor due to consenting to the Sale Order.

---

[8] The Court assumes that the cost of the insurance roughly equals its value because no persuasive evidence was presented to rebut this assumption.

Similarly, confirmation of the Debtor's amended plan did not remove the Bank's right to seek reimbursement for these expenses. Paragraph 8(i) of the Debtor's confirmed plan provides that "Administrative expenses shall be paid in full as may be approved by the Court." (Dckt. 107, at 2.)

Stated plainly, the doctrines of collateral estoppel and res judicata are not applicable in this case. The issue of whether the premiums may be an allowed administrative expense was never litigated or otherwise presented to the Court until the Bank filed the Application, and the Bank has never taken a position "clearly inconsistent" with its request to be paid an administrative expense. *Perry v. Blum*, 629 F.3d 1, 9 (1st Cir. 2010).

IV.   CONCLUSION

Under the facts and circumstances of this case, the Court will not penalize the Bank for being proactive and doing what the Debtor should have done. *Cf. Tavormina v. Weiner (In re Alchar Hardware Co.)*, 759 F.2d 867, 868–69 (11th Cir. 1985) (reversing a lower court's administrative expense award to the debtor's lessor for the debtor's electrical utility deposit because it did not arise postpetition and not for the reason that the expense was incurred by the lessor on the debtor's behalf). As an equitable matter, the Debtor continued to enjoy possession of the Combine and Flex Header and, therefore, had postpetition obligations with respect to that collateral. *See In*

*re Trimurti Investments, Inc.*, No. 6:12-bk-5071, 2012 WL 3061159, at *2 (Bankr. M.D. Fla. July 26, 2012). It is important to note that the Court is not holding that the Bank is entitled to an administrative expense because it held a note that gave it the right to obtain forced-place insurance. The Court does hold that the insurance premiums in *this* case are administrative expenses under § 503(b)(1)(A) in light of the fact that the Bank acted in good faith and released its liens, the Debtor had a duty as a debtor in possession to insure the Combine and Flex Header, and the Bank, as a previously oversecured creditor, only seeks reimbursement for what it would have already received if not for its error. After taking into account refunds and the amount of the premiums attributable to prepetition coverage, the actual and necessary expenses of preserving the estate totals $2,208.16 ($3,193.00 minus $984.84).

## O R D E R

The Application (dckt. 117) is GRANTED as modified above.  The Bank

shall be ALLOWED administrative expense claim of $2,208.16.

Dated at Savannah, Georgia, this 11th day of September, 2014.

Edward J. Coleman, III
United States Bankruptcy Judge
Southern District of Georgia